### 4181.  KNIGHT v. THE STATE.

1. The evidence in behalf of the State would not have authorized a conviction of a lower grade of homicide than voluntary manslaughter, and the jury were not required to prefer the statement of the accused, which set up the defense that the homicide was committed under the fears of a reasonable man that a felony was about to be committed upon him.

2. Where a statement of a deceased person is submitted as a dying declaration, the jury should be instructed that such evidence is admitted only upon prima facie proof of its verity, and that it is the province of the jury to determine whether the statement is in fact a dying declaration.  The jury should also be instructed that dying declarations should be received with great caution, and the bias, the feeling, and the physical and mental condition of the declarant, as well as the credibility of the alleged declaration, should be weighed by them.  And it is generally reversible error for the court to omit to charge that alleged dying declarations must not be considered by the jury, unless they are satisfied from the evidence that such declarations were made when the declarant was in the article of death (*Darby* v. *State*, 9 *Ga. App.* 701, 72 S. E.

182) ; but the grant of a new trial is not required when it is undisputed in the testimony that, at the time the decedent made the alleged statement, he was in fact in articulo mortis.

3. Drunkenness is no excuse for crime. The fact that one accused of crime was drunk at the time of the alleged crime may be shown as illustrative of his motive in the transaction, but one voluntarily drunk is as much presumed as any other person to intend the legitimate consequence of his act, and, therefore, the question is whether he intended to do the act, and not whether he intended the result of the act. If a drunken man is sufficiently intelligent to know, understand, and intend to do a certain act, and to understand that a certain consequence is likely to result from it, and does the act, he is criminally liable for the consequence of his act.

DECIDED JANUARY 22; 1913.

Indictment for murder; from Washington superior court—Judge Rawlings. April 3, 1912.

*J. E. Hyman, Goodwin & Wood, John R. Cooper,* for plaintiff in error.

*Alfred Herrington, solicitor-general, Hines & Jordan,* contra.

RUSSELL, J. The plaintiff in error was indicted for murder and was convicted of voluntary manslaughter. The present writ of error challenges the judgment refusing a new trial. It is uncontradicted in the evidence that the deceased (who was the brother of the accused) came to his death as a result of a gunshot wound inflicted by the accused. Only one witness testified for the State, and the accused rested his defense upon his own statement. According to the testimony of the State's witness, he heard the report of a gun and went to the house where these two brothers lived with their sister. He found the wounded brother upon a bed, suffering intense pain from a gunshot wound in the thigh. The defendant and the sister were present in the house. The wounded man was apparently in a dying condition when the witness reached the house, though he seemed to be perfectly rational. It was about an hour after the witness heard the gun fire before he went to the house. The wounded man told him, soon after he reached the house, that the wound was going to kill him; and, about an hour before his death, repeating that he was going to die, he made to the witness a statement which was submitted by the court to the jury. According to this statement of the deceased, the defendant cursed him and applied to him unmentionable opprobrious epithets, and he slapped the defendant, and told him that no man could speak in that way of his dead mother; the defendant got his pistol and

tried to "come on" the deceased with it, but the deceased took the pistol away from the defendant and threw him down on the floor, and hid the pistol between the mattresses on the bed; the defendant then got a shot-gun, and the deceased tried to dodge into the room, and, as he dodged, the defendant fired the fatal shot; he was shot at the door of one of the front rooms, and fell in through that door; the defendant was standing just inside of the other front room, the house being a "double-pen house," with two sheds on the back and with a little veranda (or open hallway) between. The deceased told the witness that he hid the pistol before he was shot and immediately after he took it away from the defendant, and the witness testified that he found the pistol where the deceased told him he had hidden it. The defendant came into the room where the witness and the wounded man were; he seemed to be very mad, and cursed the deceased several times. The defendant said to the witness: "I have been telling him to let me alone," and to his brother he said: "You have been bothering me so long. I have been telling you to let me alone. You have been bothering me. There is three or four more damned sons of bitches I am going to do the same way." The deceased did not tell the witness he was making a statement in contemplation of death, but he more than once told the witness that he was going to die. This witness further testified that the defendant was an exceedingly hard drinker and had been drinking for some years, and that when in a drinking condition "he seemed to have a pick at his brother and at his family;" that the defendant was drinking at the time of the difficulty, but was not as drunk as the witness had seen him; he was "very seldom with liquor out of him."

According to the statement of the accused, he had had serious domestic troubles, and was separated from his wife and children, and, on account of this, had been a very hard drinker. He was drinking all he could get the day of the difficulty, though he was running his mill that day. According to his statement, he left the mill about one o'clock, and at the dinner table found his brother (the deceased) who had been plowing, and inquired of him what sort of plowing he had been doing and how the plow worked, and suggested that he quit plowing and lay-by the corn; whereupon his brother began to quarrel and curse. The defendant stated, that he left several times to keep from having trouble with

8

the deceased; that the deceased followed him out of the room in which they were eating, into another room, where the defendant had gone to get a pillow and lie down (because he had been handling heavy sacks of corn all morning), and continued to quarrel with him; that as the defendant turned around to the deceased, the latter jumped for a pistol, which was lying on the mantelpiece, and got it, and the defendant went out; that the deceased met him at the door which goes out of the room to the little porch, and hit the defendant on his right temple with the pistol; that the defendant got up and staggered around through that room, intending to go out of the door, but there was a heavy trunk against the door, and as he started to go out he found the door was locked, and the defendant then started to go to the back door, and his sister begged the deceased to stop and come back, but the deceased replied that he was going to kill the defendant, that he was going to put an end to the defendant that day, or the defendant was going to put an end to him; that the deceased had the pistol in his hand and came back, facing the defendant again; that the defendant thought the deceased was going to kill him, and he picked up a gun that was sitting in the corner. The defendant further stated: "I don't know whether he intended to shoot me or not, but he had knocked me in the head with the pistol, and he made that remark again that he was going to put an end to me that day; and I picked up the gun. To tell the truth, in raising the gun, I don't remember any more how that gun went off than nothing in the world. I didn't want to kill him. I didn't intend to kill him; not nothing of the sort. . . If I had, I could have put the gun on him up here, but I didn't intend to kill him, but to ward him off from me with the gun; because he had practically killed me where he had hit me in the head, in the temple. . . When the gun fired he turned around and started in the room. The pistol fell on the floor, and the negro picked it up and put the pistol between the bed and the mattress. The negro told my sister that he (the negro) had put it between the bed and the mattress: He told me to give him the gun, the negro did, and I handed it to him."

In the course of his long statement to the jury (which it is not necessary to quote in full, because much of it deals with matters wholly irrelevant to the trial), the defendant stated that his brother said to him after the shooting: "You have shot me, but I don't

want you to be hurt." In another portion of the statement the defendant said that he had not intended to kill the deceased, but that the deceased was on him, and he was frenzied from being knocked down by the pistol; that he had drunk a lot of whisky up to that time; and he protested his affection for his dead brother.

It will be seen that there was sharp conflict between the testimony for the State (if the jury found that the statement of the deceased was a dying declaration) and the statement of the accused; but in no view of the testimony adduced by the State could a verdict be found for a lower degree of homicide than voluntary manslaughter; and the defendant's own statement is inconsistent with the supposition that the gun was fired by accident, although he may not have intended to kill his brother. The statement of the defendant—which was very incoherent—suggests only two possible defenses: that, acting under the fears of a reasonable man that a felony was about to be committed upon him, he shot to defend himself against the pistol in his brother's hand; or that he fired the shot while in a condition of maudlin drunkenness. Neither of these positions affords the accused a tenable defense. The jury could not find (although the defendant said he feared his brother would use the pistol) that the shot was fired in self-defense; for the defendant himself stated that the gun was fired without his knowing how it was discharged; and furthermore, the defendant does not state anything more than that his brother had the pistol, and he does not state that the deceased had drawn it on him, or was attempting to aim it, or had pointed it in his direction. As to the plea of drunkenness: This affords no excuse for crime, except under the circumstances provided by the code, as the court very properly instructed the jury. The credulity of the jury would have been subjected to a very severe strain to believe that the defendant was so drunk as not to know that the gun was being discharged in the direction of his brother, when, according to his own statement, he was sufficiently sober, only a moment previous, to engage in a conversation which he distinctly remembered at the time of making this statement, and in which he discussed with his brother even the minutiæ of their business.

There were only two preliminary questions for the jury to determine in their consideration of the evidence: (1) Were the alleged declarations by the decedent made in the article of death and when

he was conscious of his condition? And (2) was this statement credible to the jury, both as related to the credibility of the decedent and that of the witness who reported it? The jury were authorized to believe the testimony of the witness and the alleged statement of the deceased, and, in our view of the case, under this testimony, a verdict finding the accused guilty of voluntary manslaughter was demanded. It is true that the jury should have been told that dying declarations should be received with caution, and they should have been instructed that the statement of the decedent was submitted to them upon merely prima facie evidence of its verity, and that it was their province to determine whether the evidence submitted showed the alleged statement to be in fact a dying declaration. But in view of the fact that the defendant's own statement presents no defense, these errors are not of sufficient importance to authorize the grant of a new trial.

Complaint is also made, in the motion for a new trial, that the charge of the court is subject to the same objection as were the instructions in the case of *Darby* v. *State, 9 Ga. App.* 701 (72 S. E. 182). An inspection of the record, however, discloses that in the present case the court told the jury that "if a party is wounded and the wound is *mortal,* and between the time of receiving it and his death he should become conscious of his approaching death, and should make statements while in that frame of mind and while surrounded by that condition, as to the cause of his death and the party who killed him," it would be their duty to consider the statement, along with other testimony, etc. And in immediate connection therewith the court gave in charge the section of the code defining dying declarations, and instructed the jury that the person making the declarations must be in the article of death. So that the instructions in the present case are not subject to the objection urged in the *Darby* case, supra. Furthermore, in the present case there was no evidence to dispute the testimony of the State's witness that the declaration was actually made in the article of death. And for that reason, even such an instruction as that dealt with in the *Darby* case would not be prejudicial error.

The requests to charge, so far as applicable, seem to have been sufficiently covered by the charge given, except the request that the jury be instructed as to the principle embodied in section 40 of the Penal Code, with regard to crimes committed by misfortune or

accident; and there was no error in refusing this request, for the reason that neither the evidence nor the defendant's statement authorized an instruction upon this subject. *Judgment affirmed.*