33196. MILLS *v*. THE STATE.

DECIDED JANUARY 27, 1951. REHEARING DENIED FEBRUARY 27, 1951.

*H. Alonzo Woods, William A. Wells Jr.*, for plaintiff in error.
*W. H. Lanier, Solicitor-General*, contra.

MACINTYRE, P. J. The defendant Robbie F. Mills was indicted for an assault with intent to murder committed upon W. M. Fields. He was found guilty as charged and his penalty was fixed at from two to five years in the penitentiary. His motion for a new trial, based upon the usual general grounds and one special ground, was overruled and he excepted.

The special ground of the motion for a new trial assigns error upon the refusal of the trial court to charge, as requested in writing before the jury retired, the provisions of Code § 26-404, which provides: "A person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design, or intention, or culpable neglect." The defendant's contention in this ground is that the evidence and his statement to the jury show that his sole defense was based upon accident or misadventure.

From the evidence in the record, it appears that on the night of the alleged assault with intent to murder, the prosecutor, W. M. Fields, who was Chief of Police of Graymont-Summitt, Georgia, was called to a poolroom in Graymont-Summitt upon complaint that the defendant and his first cousin, Luther Mills, were there drinking and trying to raise a disturbance. It appears that there was no disturbance at the poolroom when Mr. Fields arrived, but that when the Mills boys started home in the defendant's automobile, Mr. Fields told them that they were drinking too much to drive. They proposed to have someone else drive them home and Mr. Fields offered to drive to their home in his own car and bring their driver back to town. How-

ever, upon reaching their car the defendant insisted upon driving after all. Thereupon Mr. Fields told them: "All right, you boys are too drunk to drive and you are too drunk to be here on the streets and if you can't let that man drive for you, I will just have to put you up [in jail]." He then took the defendant and Luther Mills in his car to the jail. Mr. Fields' account of events after they reached the jail is as follows: "I got out and had the flashlight in my hand, and switched the little old light on on the outside, there is a switch on the outside [of the jail]. I switched on the light and unlocked the door and Robbie F. [the defendant] was in the back seat; well, he crawled right out and walked right on in and Luther slid over under the steering wheel and I walked on in behind Robbie, reached up and pulled the light, and about that time Luther caught me by the arm and twisted it trying to take the flashlight. Robbie had started going on back like he was going into the partition there, like he was going in the back room where the cells was and he looked around there and Luther had me and I wrung loose from him and he made a pass to hit me and I didn't have a thing in the world but my flashlight and about that time they both caught me and wrung all the hide off my arms here, me and them. Finally Luther got the flashlight and hit me on the head several times and finally they got my pistol, Felton [the defendant] did. He got my pistol from my holster. I was right next to the door and there is a step down at the end of the jail about that much, I reckon (indicating), and I saw I was in trouble and I stepped up and back in the door and just as I got up there in the door, he stuck the pistol up to me that close (indicating) and shot me. My car was sitting there just outside the door and I just twisted around and sat around in the seat of the car. I had an old night stick, what you call a night stick, one of these clubs. I always kept it in the car. . . I just sat over in the car and left my feet on the pavement and reached over under there to get that stick and Felton shoved up the seat and pushed me up against the steering wheel, jumped in the car and shot right by my head and into the windshield and by that time I had the stick in my hand and I eased back there right side of the car. I thought when he come out, I knew he would come back out, I thought he would have

the pistol ahead of him and I could hit him on the arm and knock it loose from his hand. I was leaning up against the car there and I didn't wait for him to get quite far enough, I reckon, I hit the pistol instead of his arm, and then he come out of the car pretty fast and when he did I hit him on the top of the head just as hard as I could, of course I was exhausted and kind of weak. He staggered off about seven or eight steps—Luther in the meantime had come around and was getting in the car on the other side—and he staggered off about seven or eight steps and started to run just as hard as he could and Luther took to [after ?] him. Luther still had my flashlight. He got nearly to the back end of the jail and then throwed the flashlight back at me. At the time that Robbie F. got my pistol I was in the front entrance of the jail there, just inside the door about four or five feet. I don't think he ever said a word about the time he shot, the time he fired the first shot. That shot hit me right here (indicating) right there in the left groin. . ." The defendant in his statement to the jury gave the following account of the shooting: "Gentlemen, on Tuesday night of the 21st, me and Luther, my first cousin, was in the poolroom. We had been drinking. . . Directly Mr. Fields come in there and Luther went ahead and shot pool and I walked over there and I walked over there and told him that we had better go as quick as he finished that game. I walked back over to the counter to where Mr. Fields was and he hadn't said nothing. I offered to buy him a coca cola and he said, 'No, thank you,' and I turned around and Luther was done and I told him to let's go and he said, 'All right,' and Mr. Willie [Mr. Fields] spoke up and said, 'You are not able to drive your car, are you?' and I said, 'I don't know, sir,' and he said, 'I don't think you are.' I said, 'Would it be all right if I got somebody else to drive it,' and he said, 'Yeah,' and I turned to Crawford Price and asked him if he would drive it, and he said, 'Yeah.' We walked on out and why I didn't get in my car, I don't know, I don't remember if I ever went to my car or not. The next thing I remember I was in the jailhouse and we were walking in the jail, this Mr. Fields drove down in front of the jailhouse. Mr. Fields got out, opened the door and turned on the light and walked on in and they were following, I got near about the

other end, there were two doors in there and I heard them tusseling back there, and Mr. Fields hollered to Luther to git and I turned around and they was tusseling good and I thought about getting into it I reckon and Mr. Fields told me to stay back, that if I didn't he would get on both of us. That just put me on guard, and so I got into it too. Mr. Fields made a pass at the front door and was down on his knees, he was all through tusseling. Directly, I heard a shot go off and Mr. Fields hollered he was shot. He crawled out the door and Luther, he turned and headed back to the middle door. I went out behind Mr. Fields and Mr. Fields got to the car and I stepped right outside the door and I turned between the car and the jailhouse and went around in front of it and I never did hear no second shot, I don't know how it got fired or nothing. That is all I have got to say about it. I don't know how I got to the branch or how long I stayed in the branch or nothing, it must have been a pretty good while though." From the other evidence it appears that Mr. Fields' pistol was found in the branch and a photograph showing the bullet hole in the windshield of Mr. Fields' car was introduced in evidence. At one point on re-direct examination Mr. Fields also testified that at no time during the "tusseling" did he put his hand on, or touch, the pistol.

Neither the evidence which we have quoted above, nor any of the other evidence in the record, which we have considered carefully, raises an inference that the shooting of Mr. Fields was accidental or by misadventure. Mr. Fields testified unequivocally that the defendant "stuck the pistol up to me that close (indicating) and shot me." Nor does the defendant's statement lead to such an inference. Basically the defendant's statement was a general denial that he shot the prosecutor, an admission that he engaged in the assault upon him, and that he had several lapses of memory during the evening in question. He could not remember how he got to the jailhouse, though his account of the events in the poolroom agrees quite closely with that of Mr. Fields up to the point that they were leaving the poolroom. He next remembered nothing until he was in the jailhouse. Here his account of what occurred there agrees in many respects with Mr. Fields' account; although he did not unequivocally deny shooting Mr. Fields, he remembered hearing

one shot and Mr. Fields' exclamation that he had been shot. He never did hear the second shot which Mr. Fields testified he fired and knew nothing further of the affair. Under these circumstances we think the court did not err in refusing the request to charge the provisions of Code § 26-404. Neither the evidence nor the defendant's statement authorized an instruction upon the subject of accident or misadventure. *Knight* v. *State*, 12 *Ga. App.* 111, 116 (76 S. E. 1047); *Ward* v. *State*, 199 *Ga.* 203, 204 (3) (33 S. E. 2d, 689); *Freeman* v. *State*, 190 *Ga.* 335 (3) (9 S. E. 2d, 236); *Nelson* v. *State*, 187 *Ga.* 576, 577 (5) (1 S. E. 2d, 641). This ground of the motion for a new trial is, therefore, without merit.

■ The jury was authorized to find from the evidence that the defendant and his cousin Luther Mills assaulted the prosecutor, a police officer, at a time when he was attempting to jail them after having arrested them for drunkenness in the town of Graymont-Summitt. The defendant in his statement to the jury admitted his assault upon the prosecutor. The jury was also authorized to find that the defendant, during the time that he and his cousin were engaged in the assault and battery upon the prosecutor, took from the prosecutor his pistol, "stuck it up to" him and shot the prosecutor in the left groin, and that the defendant, after having shot the prosecutor, again fired the pistol at him and missed him, the bullet having gone over the prosecutor's head and into the windshield of his car. The jury was also authorized to find that the defendant then fled the scene. From these circumstances the jury was authorized to infer a specific intent to murder. *Benton* v. *State*, 9 *Ga. App.* 291 (71 S. E. 8); *Chandler* v. *State*, 54 *Ga. App.* 334, 335 (4) (187 S. E. 856); *Lovett* v. *State*, 9 *Ga. App.* 232 (3) (70 S. E. 989); *Reece* v. *State*, 60 *Ga. App.* 195 (1) (3 S. E. 2d, 229); *Manders* v. *State*, 69 *Ga. App.* 875 (4) (27 S. E. 2d, 105). It follows that the evidence authorized the verdict finding the defendant guilty of assault with intent to murder.

The court did not err in overruling the motion for a new trial for any reason assigned.

*Judgment affirmed.* *Gardner and Townsend, JJ., concur.*